UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEWARD CARNEY HOSPITAL, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>MASSACHUSETTS NURSES<br>ASSOCIATION,<br><br>     Defendant. | Civ. A. No.  1:17-cv-12465 |

## COMPLAINT

This is an action brought by Steward Carney Hospital, Inc. (the "Hospital") pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 *et. seq*., to vacate an arbitrator's award, which the arbitrator issued both in violation of public policy and in excess of the powers granted to him in the collective bargaining agreement in effect between the Hospital and the Massachusetts Nurses Association ("MNA").  The Arbitrator ignored the terms of the parties' collective bargaining agreement by adding his own progressive discipline policy to the contract and ordered the reinstatement of a terminated nurse who was observed on video participating in the abuse of a suicidal teenaged transgendered patient in the Hospital's adolescent psychiatric unit. Not only did the Arbitrator dispense "his own brand of industrial justice" by rewriting the parties' contract, but he ordered the reinstatement of a nurse deemed unqualified by the Hospital to serve in its adolescent psychiatric unit, thereby directing the Hospital to violate clear public policy. Accordingly the Arbitrator's Award must be vacated.

## I. JURISDICTION & VENUE

1.     This Court has jurisdiction over this matter pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and 28 U.S.C. § 1331.

2.      Venue is proper in this District pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1391 because the subject matter of the grievance to which the Arbitration Award at issue relates arose at the Hospital's campus in Boston, Massachusetts and the Arbitration Award was issued in Massachusetts.

## II. PARTIES

3.      Steward Carney Hospital, Inc. is a Delaware corporation with a principal place of business at 111 Huntington Avenue, Boston, Massachusetts 02199.

4.      Massachusetts Nurses Association is an unincorporated labor organization within the meaning of 29 U.S.C § 185 and represents employees in an industry affecting interstate commerce. MNA maintains a principal office at 340 Turnpike Street, Canton, Massachusetts 02021.

## III. FACTS

### The Collective Bargaining Agreement and the Hospital's Policies

5.      The Hospital and MNA are parties to a collective bargaining agreement ("CBA") that provides for the terms and conditions of employment for all registered nurses employed by the Hospital, excluding the President, the Vice-President-Patient Care Services, Director-Continuing Care, Directors of Nursing, Nurse Supervisors, Managers of Information Systems and Per Diem Pool, Clinical Managers, members of religious orders, nurses regularly assigned to satellite health centers and all other employees employed by the Hospital at its campus located at 2100 Dorchester Avenue, Boston, Massachusetts 02124  A true and accurate copy of the Collective Bargaining Agreement (effective May 31, 2015 through November 30, 2017) is attached hereto as Exhibit A.

6.      Article IV of the CBA, the Management Rights clause, expressly retains the right of the Hospital *inter alia,* "to require reasonable standards of performance and the maintenance of discipline, order and efficiency; the determination of medical and nursing care standards, operational

2

and other policies . . . . [and] the right to hire, transfer temporarily, discharge, suspend, demote or to otherwise discipline nurses for just cause." Ex. A, Art. IV, § 4.1.

7.      Article XV of the CBA provides as follows: "A nurse who has completed her probationary period and has acquired seniority under this Agreement shall not be suspended, discharged, demoted or otherwise disciplined except for just cause." Ex. A, Art. XV, § 15.8.

8.      Article XVI of the CBA sets forth a process by which an aggrieved employee can challenge the Hospital's disciplinary decision through a three-step grievance process and arbitration. Ex. A, Art. XVI, § 16.3.

9.      Employee grievances that are not satisfactorily resolved during the grievance process may be referred to arbitration. Ex. A, Art. XVI, § 16.3.

10.     Article XVI, § 16.5 states "[i]n the case of a grievance, the function of the arbitrator is to determine the interpretation and application of specific provisions of the Agreement. **There shall be no right in arbitration of a grievance to obtain, and no arbitrator shall have any authority or power to award or determine, any change in, modification or alteration of, addition to, or detraction from, any of the provisions of this Agreement.**" Ex. A, Art. XVI. § 16.5 (emphasis added).

11.     The Hospital's adolescent psychiatric unit ("APU") is licensed by the Massachusetts Department of Mental Health ("DMH").

12.     DMH requires that its licensed facilities comply with its directives, policy documents, and state regulations, including DMH Policy No. 07-02. A true and accurate copy of DMH Policy No. 07-02 is attached hereto as Exhibit B.

13.     Section D.1 of Policy 07-02 charges the Hospital, "[a]s soon as possible after admission," to develop an "Individual Crisis Prevention Plan (sometimes referred to as a 'Safety Tool')" for each patient. Exhibit B at 39.

3

14.     The Safety Tool is created in collaboration with the patient and is designed to allow the patient, in her own words, to identify potential triggers, i.e. what "sets the patient off"; "what might make the patient more distressed or escalate in his or her behavior," as well as interventions that have been successful in the past in deescalating the patient.

15.     DMH Policy 07-02 charges the Hospital to develop and implement policies to ensure that DMH's regulations are followed by all Hospital personnel.  Exhibit B at 38-39.

16.     In response to this directive, the Hospital maintains its own Restraint and Seclusion Policy, POC 67. A true and accurate copy of POC 67 is attached hereto as Exhibit C.

17.     POC 67 lists 10 potential alternative interventions that should be utilized before resort to restraint or seclusion: (1) use of the Individualized Crisis Prevention Plan; (2) verbal intervention and de-escalation techniques; (3) decreased stimulation; (4) sensory interventions; (5) physical/diversion activities; (6) time-out; (7) relaxation techniques; (8) appropriate medication, including PRN medication; (9) increased visual observation; and (10) moving patient within vision of nurse's station.  Exhibit C at 3.

18.     POC 67 requires an "Admission Assessment" during which information that "might indicate causes of behavioral escalation and techniques used to avoid or manage such behavioral events" is obtained.  Exhibit C at 2.  This data, collected from the patient and/or her family is used to develop the Safety Tool.  *Id.*

19.     The Safety Tool is the very first alternative listed in POC 67, and anyone who authorizes restraint or seclusion is required to refer to the safety tool prior to doing so.

20.     The Hospital also maintains an Abuse and Neglect Policy, RI-04. A true and accurate copy of RI-04 is attached hereto as Exhibit D.

21.    The Hospital's Abuse and Neglect policy states that "<u>all</u> health care disciplines are <u>required</u> to report . . . [s]uspected abuse, neglect or harassment from staff, other patients or visitors in the hospital setting." Exhibit D at 2 (emphasis in original).

22.    With respect to the abuse of a child occurring in the acute care setting, Hospital staff are directed to make an oral report to their immediate supervisor or HR staff. Exhibit D at 11.

23.    The Board of Registration in Nursing ("BORN") defines abuse as "any impermissible or unjustifiable contact or communication with a patient which in any way harms or intimidates, or is likely to harm or intimidate, a patient. Abuse may be verbal or non-verbal, and may cause physical, sexual, mental, or emotional harm." 244 CMR 9.02.

24.    BORN licensure also requires, among other things, that nurses comply with the following statutes and related regulations: M.G.L. c. 111, § 70E (Patients' or Residents' Rights); M.G.L. c. 72G (obligation to report abuse of patient or resident); and M.G.L. c. 123, § 21 (requirements for use of restraint or seclusion of mentally ill person). *See* 244 CMR 9.03(6).

25.    A nurse "shall not abuse, neglect, mistreat, abandon, or otherwise harm a patient[.]" 244 CMR 9.03(15).

26.    A failure to comply with BORN regulations or with any other laws and regulations related to the practice of nursing may result in the loss of the nurse's license. *See* 244 CMR 9.03.

27.    The Hospital's Department of Psychiatry Policy 1RI-8, "Psychiatric Staff, Patient Relationships" requires all staff to immediately report "any inappropriate interaction with a patient" to their supervisor, and are warned that the failure to do so "will result in an immediate termination of employment." A true and accurate copy of Policy 1RI-8 is attached hereto as Exhibit E.

### The Discharge of Jacqueline Hruby and the Grievance

28.    Jacqueline Hruby was a nurse at the Hospital's Dorchester campus and a member of the bargaining unit.

29.     Hruby was fully trained about all of the policies applicable to dealing with patients in the APU, including the DMH Human Rights Handbook (07-02) (Exhibit B); the Restraint and Seclusion Policy (POC-67) (Exhibit C), the Abuse and Neglect Policy (RI 04) (Exhibit D), the BORN Regulations; and the Patient Relationship Policy (1RI-8) (Exhibit E).

30.     On November 16, 2015 Hruby was assigned to observe, in the unit's dining room, a transgendered female patient with a history of self-injurious and suicidal behaviors.

31.     Hruby failed to consult the patient's "safety tool" at any time during her observation of the patient on November 16, 2015.

32.     During the course of her monitoring of the patient, the entirety of which was captured by the Hospital's surveillance cameras, Hruby was observed standing idly by as Nicole Sanchez, a probationary nurse with less than 30 days of credited service, proceeded to forcibly yank the patient's chair out from underneath the patient as the patient tried desperately to hold on to the table before the patient ultimately fell to her knees.

33.     A short time later, Hruby and Sanchez can be observed laughing at and mocking the patient's attempts at communication, which, as described in the patient's safety tool, included hand gestures.

34.     Later on, Hruby stood against the sink and did nothing as Sanchez attempted to pull the table out from under the patient until the patient fell to the floor.

35.     The patient then laid on the floor in the fetal position for nearly four minutes. When the charge nurse appeared in the dining room, Hruby failed to tell her how the patient ended up on the floor. Thereafter three large male security officers entered the dining room. Unknown to Hruby, since she had failed to review the patient's safety tool, was that the patient had repeatedly listed "being around boys or men" as potential triggers.

36.     Security then forcibly carried the patient limb-by-limb, out of the dining room, down the hall, and into the Hospital's "quiet room," where she was chemically and mechanically restrained— all while Hruby did nothing to prevent it or explain that her behavior and that of the other nurse were the cause of the patient lying on the floor.

37.     The Hospital was required by regulation to report the restraint of the patient to the Department of Mental Health, which it did on November 23, 2015, followed by a second report on December 4, 2015. A true and accurate copy of the reports submitted to DMH are attached hereto as Exhibit F.

38.     The Hospital began an investigation into the events leading to the restraint on November 20, 2015.

39.     On November 27, 2015, the Hospital interviewed Hruby in the presence of her union representative.

40.     Hruby confirmed that there was a previously scheduled event in the dining room which necessitated the removal of the patient; that Hruby observed Sanchez's pulling of the chair out from underneath the patient; that Hruby and Sanchez were trying to annoy the patient; and that Hruby failed to review the patient's safety tool.

41.     As a result of the Hospital's investigation, Hruby and Sanchez were terminated on December 15, 2015.

42.     In the Hospital's judgment, termination was the only appropriate disciplinary action.

43.     MNA grieved Hruby's termination and the parties submitted the grievance to arbitration for determination by Arbitrator Michael W. Stutz.

### The Arbitration Proceeding and Award

44.     The arbitration hearing took place over six days between January and June 2017 before Arbitrator Stutz.  An official transcript of the hearing was prepared.

45.     During the arbitration, Dr. Joseph Weinstein, the Chief Medical Officer for Steward Health Care System LLC, testified that the grievant's actions were "the poster child for a human rights violation."

46.     When asked whether it was correct, based on her understanding and training as an experienced psychiatric nurse, that *she did not think that anything inappropriate happened to that patient while she was with the patient and Sanchez in that room*, Hruby answered "Yes."

47.     During the arbitration, following Hruby's testimony, Katherine O'Neill, LICSW, Executive Program Director, Behavioral Health Department at the Hospital, testified that based on Hruby's testimony in which she insisted she had done nothing wrong, O'Neill had "every concern in the world that, if she were to come back and work at Carney Hospital with children again, that this would happen again."

48.     The parties stipulated to the following issue: Did Carney Hospital have just cause to terminate the employment of Jacqueline Hruby? If not, what shall be the remedy?

49.     On November 14, 2017 Arbitrator Stutz issued his decision ordering the Hospital to reinstate Jacqueline Hruby.  A true and accurate copy of the Arbitration Award is attached as Exhibit G.

50.     In his decision, Arbitrator Stutz found "Patient A's safety tool was admittedly not reviewed or followed by the grievant . . . ."  Ex. G at 20.

51.     As Arbitrator Stutz held, "the Hospital nonetheless had just cause to discipline the grievant for her failure to consult the safety tool during the extended time she worked with the patient in crisis. The responsibility of the other two nurses does not excuse the grievant's omission in this regard." Ex. G at 21.

52.     Arbitrator Stutz likewise held that Sanchez' "decision to move the chair from under the patient was obviously a mistake that violated regulations and the requirement that patients be treated with dignity." Ex. G at 22.

53.     Arbitrator Stutz further found that "the grievant was standing nearby when Ms. Sanchez moved the chair, did not intervene, and appears to smile or laugh when she saw the chair pulled out from under the patient." Ex. G at 22.

54.     As the Arbitrator noted, "It is beyond question that nurses are professionally and legally obliged to report patient mistreatment. This obligation can be enforced by management with discipline." Ex. G at 22.

55.     Arbitrator Stutz agreed that "the grievant should have appreciated the impropriety of Ms. Sanchez's conduct, and should have intervened, at least verbally, especially when Ms. Sanchez started pulling the table from under the patient. Her failure to act provides cause for discipline . . . . Ex. G at 23.

56.     As Arbitrator Stutz held, "[t]he grievant should have intervened verbally with Ms. Sanchez on behalf of the patient, and should have reported to supervision how the patient ended up on the floor. There was just cause to discipline the grievant for failing to intervene with Ms. Sanchez or report mistreatment to supervision." Ex. G at 23.

57.     Despite ruling that the Hospital had just cause to discipline Hruby, Arbitrator Stutz inexplicably and in disregard of the limits on his authority barring him from making "any change in, modification or alteration of, addition to, or detraction from, any of the provisions" of the CBA, added his own, unique, progressive discipline policy to the parties' CBA.  Ex. A, Art. XVI. § 16.5.

58.     According to the Arbitrator, his self-created progressive discipline policy contains *only* a "narrow exception" for "capital offenses" such as violence and theft "for which termination is appropriate in the first instance, without progressive, corrective discipline." Ex. G at 23. Presumably

in his view, an employer has no discretion to terminate employees—regardless of its own policies—where the determination does not meet the Arbitrator's narrow standard.

59.     Despite finding that that the Hospital proved that Hruby failed to consult the safety tool, failed to intervene when Sanchez pulled a chair out from under the patient, and failed to inform the charge nurse how the patient wound upon the floor (therefore depriving the charge nurse of sufficient data upon which to base her own interventions with the patient), the Arbitrator nevertheless converted the Hospital's termination to a written reprimand. Ex. G at 24-25.   In his view—notwithstanding the terms of the contract or the Hospital's policies that were in evidence—Hruby's behavior toward the patient was not a "capital offense."

## COUNT I

60.     The Hospital re-alleges and incorporates Paragraphs 1-59 as if fully set forth herein.

61.     Arbitrator Stutz exceeded his powers by adding a progressive discipline policy to the CBA in violation of Article XVI of the CBA.

62.     Arbitrator Stutz exceed his powers by finding that the Hospital can only terminate the grievant without resorting to progressive discipline for "the most serious cases of misconduct, like violence and theft, when progressive discipline is not required for offenses so egregious that they are considered 'capital' offenses." Ex. G at 23.

63.     Arbitrator Stutz exceed his powers and dispensed his own brand of industrial justice in place of the terms set forth in the CBA when, despite finding that the Hospital had just cause to discipline the grievant, he created a progressive discipline policy which circumscribed the grounds for termination and ordered that the grievant be reinstated.

64.     Because Arbitrator Stutz exceeded his limited authority under the terms of the CBA and his Award does not draw its essence from the CBA, this Court should vacate the Award pursuant to 9 U.S.C. § 10(a)(4).

## COUNT II

65.     The Hospital re-alleges and incorporates Paragraphs 1-64 as if fully set forth herein.

66.     Enforcement of the Award of reinstatement in favor of the grievant, where the grievant was found to have committed serious substandard nursing practices, would violate established Massachusetts public policy in favor of ensuring the delivery of safe and competent nursing care.

67.     Enforcement of the Award of reinstatement in favor of the grievant, where the grievant was observed on film while participating in the abuse and mistreatment of an adolescent psychiatric patient would violate well established Massachusetts public policy in favor of not knowingly employing individuals who the Hospital knows have abused patients and who the Hospital believes, based on its observations of their behavior, are not qualified to work in an adolescent psychiatric unit.

68.     Because enforcement of Arbitrator Stutz's Award would violate well established Massachusetts public policy, the Award must be vacated.

WHEREFORE, Plaintiff respectfully requests that:

a.  This Court enter a judgment vacating the Award or modifying the Award to conform to the requirements of the Agreement and applicable law.

b.  This Court grant Plaintiff such other and further relief as may be just and proper.

Respectfully submitted,

STEWARD CARNEY HOSPITAL, INC.

*/s/ Joshua D. Nadreau*
Joseph W. Ambash (BBO No. 017060)
Joshua D. Nadreau (BBO No. 688970)
FISHER & PHILLIPS LLP
200 State Street, 7th Floor
Boston, Massachusetts 02109
T: (617) 722-0044
F: (617) 532-5899
jambash@fisherphillips.com
jnadreau@fisherphillips.com

Dated: December 14, 2017