## THE LABOR RELATIONS CONNECTION, LLC
## ARBITRATOR'S OPINION AND AWARD
Michael W. Stutz, Arbitrator

_____

In the Matter of Arbitration between:

## MASSACHUSETTS NURSES ASSOCIATION

**-and-**

## STEWARD CARNEY HOSPITAL

*Jacqueline Hruby Termination*
*LRC Case No. 277-16*

_____

## <u>AWARD of the ARBITRATOR</u>

The undersigned arbitrator, having been designated by the Parties through the offices of The Labor Relations Connection, LLC, pursuant to their collective bargaining agreement, and having duly heard the proofs, allegations and contentions of the Parties, AWARDS as follows:

1) Carney Hospital had just cause to discipline, but not to terminate, the grievant, Jacqueline Hruby.

2) As remedy, the Hospital shall: a) convert Ms. Hruby's discharge to a disciplinary warning; b) reinstate her to her position; and c) make her whole for lost benefits under the Contract, including, *inter alia*, seniority and back pay, minus interim earnings or unemployment benefits, if any, plus statutory interest.

_____

November 14, 2017                                Michael W. Stutz

## BACKGROUND

Hearings in this matter were held on January 23 and 27, March 22, May 15 and 25, and June 21, 2017, in Dedham, Massachusetts, before the undersigned, appointed arbitrator by the parties pursuant to their collective bargaining agreement through the offices of The Labor Relations Connection, LLC.

Fisher & Phillips, LLP, by Joseph W. Ambash, Esq. and Joshua D. Nadreau, Esq., represented the Hospital. McDonald Lamond Canzoneri, by Jack J. Canzoneri, Esq. and John O. Killian, Esq., appeared on behalf of the Union.

Written closing arguments from both parties were received on September 15, 2017. The parties agreed this award is timely issued on November 14, 2017.

## AGREED ISSUES

The parties submitted the following questions to arbitration:

1) Did Carney Hospital have just cause to terminate the employment of Jacqueline Hruby?
2) If not, what shall be the remedy?

## STATEMENT OF THE CASE

Carney Hospital (the "Hospital," "Employer" or "management") and the Massachusetts Nurses Association (the "Union") are parties to a collective bargaining agreement that provides for the arbitration of disputes, including discipline. This case involves termination of a registered nurse for her part in the events leading up to an unnecessary restraint and seclusion of a patient in the Hospital's adolescent psychiatric unit (the "unit").

The unit is a secure, locked facility with 14 beds for patients aged 13-18 who are involuntarily committed to treat serious psychiatric conditions. The Commonwealth of Massachusetts' Department of

Mental Health ("DMH") oversees the Hospital's operation of the unit. The Hospital must follow DMH regulations as a condition for licensure. Staffing on the grievant's evening shift on the night in question was one charge nurse and two staff nurses. Responsibility for charge duties rotates between nurses.

Jacqueline Hruby (the "grievant") worked in the unit from January 2015 until her termination December 15, 2015. She previously worked for five years in geriatric psychiatry at Quincy Medical Center. She began her work as a registered nurse in California in 1997.

DMH is committed to eliminating restraint and seclusion as techniques for control of patients, and requires use of alternatives first.

Hospital policy allows use of restraints and seclusion to prevent injury:

> **only in emergency situations when there is the substantial risk of or the occurrence of serious physical assault or self-destructive behavior**. When alternatives to restraint and seclusion are exhausted, measures are taken to minimize duration of restraint or seclusion and maximize patient safety while in restraint or seclusion.
> [Emphasis supplied]

The policy requires staff to try alternatives before restraints, including reference to the safety tool, verbal intervention, de-escalation and relaxation techniques, decreased stimulation, time-out, physical/diversion, or sensory intervention, like aroma therapy.

The grievant was terminated as the result of her involvement in an incident on November 16, 2015 involving a transgendered female patient with a history of self-injurious and suicidal behaviors ("patient A," or the "patient"). At the time, the unit was staffed by Sarah Bolger, Charge Nurse, Nicole Sanchez, RN, the grievant, RN, and several Mental Health Workers ("MHW's"). Patient A was assigned to Ms. Sanchez.

Ms. Bolger ordered the restraints to move the patient from a room where a baking class was scheduled to be held even though an alternative space that had previously been used for this baking class was available. Four male security guards responded to Ms. Bolger's call, and found the patient rolled in a ball on the floor.

The evidence concerning the incident consists of videos, reports and testimony of the grievant. Neither Ms. Bolger nor Ms. Sanchez, nor any Mental Health Workers who were present during the incident, testified.

The video reveals that the patients and staff sat at the table in the kitchen and ate dinner. Patient A ate some food on her tray, pushed it away, and put her head down on the table, where she remained after the other patients and the staff left the kitchen.

An unidentified MHW mentioned to the grievant that patient A was in the kitchen with her head down. Charge Nurse Bolger tried to interact with the patient, who was mute and unresponsive. Considering the patient's suicidal/self-injurious behaviors, Ms. Bolger asked the grievant to watch the patient to make sure she didn't hurt herself.

The video shows the grievant watching the patient, standing about 10-15' away, leaning against the counter or the wall. Ms. Bolger came and went. Ms. Sanchez tried to get the patient to respond with humor and hand gestures. Ms. Sanchez pulled the patient's chair out from under her - slowly, deliberately, but forcefully, removing the patient's seat, leaving her apparently kneeling on the floor. Ms. Sanchez then tried to pull the table out from under the patient's head, but reconsidered, and stopped. A few minutes later, the patient fell to the floor, and curled into a ball.

Ms. Bolger saw the patient on the floor, and threatened to call security if the patient remained. The patient did not move, remained unresponsive, Ms. Bolger called security; male security guards arrived and carried the patient out of the kitchen, flailing, kicking, and, reportedly, screaming. The patient was put into four-point restraints

and medically restrained, i.e. given drugs, and secluded for an hour and forty minutes.

The patient filed a complaint about her treatment during the incident in which she alleged that staff failed to follow her safety tool. Hospital management watched the video, which revealed no danger of injury to the patient or others, (at least until several male security officers put their hands on the patient), and an investigation ensured.

When Ms. Sanchez pulled the chair from under patient A, at first gently and slowly, but with a final determined tug, the grievant stood impassively nearby, briefly smiling. After Ms. Sanchez tried to pull the table away from Patient A, the grievant approached the patient and touched the patient reassuringly. The grievant did not recall that Ms. Sanchez attempted to move the table.

The video was discussed at three meetings. Cameron Bateman, Union Associate Director, testified that he raised the issue at the December 15, 2015 termination meeting when he asked Andrea Beruve, "Was there a video?"  Ms. Beruve responded there was no video, they got their information from witness statements.

At a second meeting on January 26, 2016, Mr. Bateman brought up the termination of the grievant. Jane Metzger said the restraint never needed to happen. "I can't believe what I saw." Mr. Bateman asked how she "saw," and Andrea replied that management didn't use the video, and any videos were deleted, if they existed.

During a mid-March 2016 step two grievance meeting, Mr. Bateman asked Andrea, "Sure you didn't use any cameras?" and she replied, "Yes, we didn't use any video, only statements."

Finally, Mr. Cameron's information request dated January 12, 2016, sought "copies of all evidence … used to make the decision to terminate."

About one year later, in January 2017, two weeks before the first arbitration hearing, Hospital counsel provided Union counsel with the video recordings.

Andrea Beruve, Human Resources Director and previously Human Resources Manager, testified at arbitration that she did not tell Mr. Bateman there was no video. Rather, she told Mr. Bateman that the Hospital did not rely on video to make the termination decision. She may have mentioned the deletion after 30 days, which she heard about during bargaining with the Union over the newly-installed video cameras in the unit. Ms. Beruve testified that the cameras were obvious and notices of video recording are posted throughout the unit.

The Hospital never issued a termination letter. Katherine O'Neil, Executive Program Director, at the December 15, 2016 termination meeting, read the grievant and her Union a single typed paragraph from a document introduced into evidence, with four reasons:

> Jacqui – After our investigation we have found that you failed to follow protocol in not reviewing the Safety tool or pulling out the Safety tool during the Patient's Sit-in. You did not take action or inquire about a sitter. Jacque participated in joking with Nicole about the patient's hand gestures. Jacqui did not ask/instruct Nicole to stop moving the chair or table.

The Hospital requires reports of the restraints. In this case, the report was filled out by several staff members. On the portion filled out by the grievant, she wrote that the Safety Tool was used and alternatives to use of restraints were offered. She explained at arbitration that she assumed that Ms. Sanchez consulted the Safety Tool because the patient was assigned to her and nurses commonly familiarize themselves with safety tools for their assigned patients.

A portion of the report that was not filled out by the grievant described the behavior of Patient A that required the restraint:

Unprovoked became agitated, assaultive towards staff, unable to be redirected, unwilling to take PO medication – screaming out of control.

The Safety Tool questionnaire that patient A filled out reveals that she prefers female providers, and does not like being forced to talk or answer lots of questions, being touched, darkness, being teased or picked on, loud noises, yelling and being around boys or men. She also wrote, 'Important people!!! 'Stupid'".

Her noticeable warning signs when she gets upset include: becoming very quiet; crying; swearing; pacing; isolating/avoiding people; and not eating.

Interventions that help patient A feel safe or help her to calm down include: staying in her room; taking a hot shower/bath; writing in a journal; lying down; going for a walk; yoga/Tai Chi; doing arts/crafts; and dance group.

Patient A finds loud talking particularly upsetting, and feels safest and is best able to calm down in corners.

The grievant was unfamiliar with Patient A's Safety Tool, and did not refer to it during the incident because the patient was not assigned to her, and she did not feel she could leave the patient alone to retrieve the tool which was with the patient's chart.

The grievant did not inquire about a sitter which she said was the Charge Nurse's role. In fact, Ms. Bolger assigned the grievant to perform the duties of a sitter, watching over the patient to make sure she didn't hurt herself.

The grievant denied that she or Ms. Sanchez made fun of the patient. The grievant has no recollection of Ms. Sanchez moving the table, although she saw it on the video.

7

The grievant observed Ms. Sanchez move the chair from under the patient, which she described as a slow and gentle effort to get the patient to stand up, with no intent to, nor risk of, harm.

When asked on cross-examination about her responsibility when she saw Ms. Sanchez move the chair, the grievant responded that her duty was to make sure the patient was safe; she saw no danger to the patient, and she felt no need to intervene.

The grievant testified that Ms. Bolger decided to call security after the patient was unresponsive. Ms. Bolger told the patient that she would have to call security if she remained in the kitchen.

The grievant testified that she and Ms. Sanchez used humor to try to communicate with the patient. She denied joking with Ms. Sanchez about the patient or making fun of the patient. The grievant testified they tried leaving the patient alone, they offered a telephone call or writing in a journal.

The grievant agreed that nurses have an obligation to take action if they see something wrong.

Although Hospital President Walter Ramos made the final decision to terminate the grievant, the Hospital presented testimony of Katherine O'Neil and Joseph Weinstein to explain the decision.

Katherine O'Neil testified that she understood she was the decision maker, with the caveat that Dr. Ramos could overturn her decision. Ms. O'Neill relied on the Hospital's Department of Psychiatry, "Psychiatric Staff, Patient Relationships" which provides:

> In order to ensure that psychiatric patients are not subjected to inappropriate physical or social relationships with a member of the treatment team, the following guidelines have been developed:

> 1. Should a staff member witness or suspect any inappropriate interaction with a patient it should be immediately reported to their supervisor.

When Ms. O'Neill reviewed the video at arbitration, she identified he portion where she concluded that the grievant and Ms. Sanchez made hand gestures that mimicked the patient. Ms. O'Neill pointed to the grievant laughing after Ms. Sanchez jumped up and down, and stated that it is inappropriate to laugh and joke with a distressed patient in crisis.

Ms. O'Neill read a statement with four reasons for terminating the grievant at her December 15, 2015 termination meeting, including joking with Ms. Sanchez about the patient's hand gestures and her failure to ask/instruct Ms. Sanchez to stop moving the chair or table, and her failure to review the patient's Safety Tool.

Ms. O'Neill testified that the joking was not to deescalate the situation because during the investigation Ms. Sanchez said she was trying to annoy the patient to get her to move. Ms. O'Neill concluded that the grievant should have stopped Ms. Sanchez when she moved the chair and the table.

Ms. O'Neill cited the patient's right to humane treatment in support of the allegation that pulling the chair was prohibited. She cited the definition of abuse that includes willful infliction of injury, intimidation, emotional abuse.

The Union established that no report of abuse was filed with the State.

Ms. O'Neill testified that the baking event scheduled for the Kitchen does not have to be held in the Kitchen. "We have a few rooms."

Joseph Weinstein, Chief Medical Officer at Stewart since July 1, 2016, was Chief Medical Officer at Carney at the time of the decision to terminate the grievant. He recommended termination because the care provided by the grievant and Ms. Sanchez was inhumane.

Dr. Weinstein watched the video at arbitration of the grievant's conduct on November 16, 2015 with patient A. He pointed to the grievant's failure to intervene when Ms. Sanchez pulled the chair out from under the patient and attempted the same with the table, her hand gestures, laughing, touching the patient, and failure to offer crayons. Dr. Weinstein did not know whether the grievant consulted the patient's Safety Tool.

Patient A wrote in the restraint report that she had no idea why the restraint was required. The restraint made her feel, "like I wanted to die." When staff wants her to calm down, they should ignore her for five minutes, so she can calm down. She asked that staff "actually read my information."

Ms. Sanchez was terminated for her part in the incident, and Ms. Bolger received "coaching."

**Regulations and Policy**:

DMH Human Rights Handbook says that to accomplish the goal of eliminating restraints and seclusion,

> DMH endorses and promotes a public health model that values input from patients, families, staff and advocates, and that emphasizes:
>
> Primary: **early intervention which focuses on the use of creative, least restrictive alternatives, tailored to the individual, thereby reducing the need for restraint or seclusion**; and
> Tertiary Prevention: reversing or preventing negative consequences when, in an emergency, restraint or seclusion cannot be avoided.
> [Emphasis supplied]

Hospital policy is to use restraints only in emergency situations where there is

**substantial risk of or the occurrence of serious physical assault or self-destructive behavior**. When alternatives to restraint and seclusion are exhausted, measures are taken to minimize duration of restraint or seclusion and maximize patient safety while in restraint or seclusion.
[Emphasis supplied]

## POSITIONS OF THE PARTIES

**Hospital:**

The Hospital argues that there was just cause to terminate the grievant for her part in the incident with patient A, considering the classic seven tests of just cause.

According to the Employer, the grievant was trained in, and understood, the Hospital's restraint and abuse and neglect policies, and she understood that failure to comply with them could result in her termination.

The Hospital policies are reasonable and apply to the conduct with which the grievant is charged.

The investigation was fair and objective.

The grievant permitted a patient to be abused in her presence without intervening, verbally or physically, or reporting the abuse to supervision.

According to the Hospital,

> Hruby's failure to intervene on the patient's behalf as Nurse Sanchez forcibly removed the patient's chair out from under her or attempted to do the same with the table was a breach of the patient's trust and is no different than if Hruby had pulled the chair or table out herself.

The Hospital argued that pulling the chair was intimidation which fits the Hospital's definition of abuse.

The Hospital notes that Sanchez was less experienced which increased the grievant's duty to intervene.

> Hruby's failure to prevent or intervene in the abuse of a vulnerable patient is an alarming display of apathy unbecoming of a nurse.

The Hospital terminated the grievant for her failure to consult the patient's safety tool, failure to inquire about a 1:1 sitter, for mocking the patient's hand gestures and for sitting "idly by" as Nurse Sanchez pulled out the patient's chair from underneath her.

The Hospital points to a case where it terminated a nurse for throwing water on a patient, improperly restraining and yelling at a patient.

The Hospital cites a decision by Arbitrator Michael Ryan, dated October 11, 2016, upholding termination of a nurse who observed another nurse restraining patients by jamming their chairs under a table a year after staff was counseled against the practice. Ryan wrote:

> Again, it is difficult to find a meaningful distinction between the nurse who set up the restraint and the CNA who observed that and then undid it hours later when the patients could be returned to their rooms.

Ryan found the observing nurse responsible for the restraint and upheld the termination.

Arbitrator Tammy Brynie upheld termination of the nurse who actually restrained patients in the Ryan matter.

According to the Hospital, termination of Nurse Hruby in this case was reasonable given the egregiousness of the grievant's misconduct and the risk to patient safety.

The Hospital asks the arbitrator to deny the grievance and uphold the termination.

**Union:**

The Union asks the arbitrator to dismiss the case against the grievant because the Hospital violated her due process rights by not providing written reasons for her termination, by not providing testimony of the decision-maker, and by withholding videos of the incident until two weeks before arbitration.

The Union asks the arbitrator to adversely infer there was no rationale to terminate the grievant since the Hospital failed to provide the grievant and her Union with a termination letter with the Company's reasons for her termination, and it failed to present the Hospital's decision-maker, President Ramos, as a witness at arbitration. The Union asks the arbitrator to conclude that there was no rationale for the grievant's termination, and to dismiss the case.

The Union also argues that the Hospital's failure to provide the video until two weeks from arbitration denied the Union a fair ability to use the video to respond to the charges and to prepare its case, which violated the grievant's right to due process. The Union asserts that, therefore, the Hospital did not have just cause to terminate the grievant.

If the arbitrator proceeds to the merits, the Union asks the arbitrator to disregard several new allegations raised by the Hospital for the first time at arbitration, including: violation of the patient's human and civil rights; failure to provide the patient with writing tools and comfort and space; failure to provide the patient with a chair and medical evaluation; holding grievant responsible for inappropriate restraint of the patient; that the grievant mocked the patient; and false notations in patient A's medical record.

The Union says the arbitrator may, at most, consider the four reasons for termination that management provided to the grievant at the termination meeting:

1) Failure to review the patient's safety tool

The Union argues no rule required the grievant to review the patient's safety tool because the patient was not assigned to her. The grievant was assigned to stay with the patient and did not have time to leave the area during the incident to find the document and read it.

2) Failure to inquire about a sitter

No rule requiring the grievant to inquire about a one-to-one sitter under the circumstances exists.

3) Participation in joking with Sanchez about the patient's hand gestures.

The Union strenuously denies that the grievant made fun of the patient. Rather, Union argues that the video shows hand gestures and smiling. The Union asserts that humor is a trusted, positive de-escalation technique.

4) Failure to tell Sanchez to stop moving the chair and the table.

It is the Union's position that the circumstances created no obligation for the grievant to intervene with Sanchez to protect the patient because pulling the chair out from under the patient did not create any risk of injury to the patient.

Finally, the Union argues that management never put the grievant on notice that she could be terminated for any of her alleged misconduct, and that, even if the grievant committed misconduct, termination was too harsh a penalty, and should be converted to a non-disciplinary counseling.

The Union asks the arbitrator to sustain the grievance, and, as remedy, to reinstate the grievant, purge the termination notice from her personnel record, make her whole for all losses, including back pay, plus 12% quarterly-compounded interest.

## OPINION

This arbitral review of the Hospital's decision to terminate the grievant requires me to decide whether the Hospital met its burden of proving that the grievant was guilty of misconduct or failures of performance, as charged, and, if so, whether termination was appropriate under all the circumstances.

The Union raises threshold, potentially determinative, allegations that due process violations by the Hospital require dismissal of the charges because: 1) the Hospital failed to provide reasons for termination in writing, failed to provide testimony of the decision-maker at arbitration; and 2) failed to produce the videos of the incident for the grievant and Union until shortly before arbitration.

At the termination meeting, Ms. O'Neill read a short statement introduced at arbitration with four reasons to terminate the grievant:

1) Failure to review the patient's safety tool.
2) Failure to inquire about a one-on-one sitter.
3) Participation with Sanchez in joking about the patient's hand gestures.
4) Failure to tell Sanchez to stop moving the chair and the table.

An unfair labor practice charge was, or had been, filed by the Union regarding the newly installed video cameras in the unit.[1]

The Hospital never acknowledged existence of a video, and claimed to the Union that they did not rely on video, if it ever existed. Two weeks before arbitration the video was supplied to the grievant and Union.

The grievant, a long-term nurse, was a relatively new hire at the Hospital. Previously she worked in a geriatric psychiatric unit at another hospital. She started in the Hospital's adolescent psychiatric unit in January 2015.

---

[1] The unfair labor practice charge was not introduced into evidence, and there is no evidence when it was filed. There was testimony that it was settled.

Patient A was a transgendered female teenager with suicidal and self-injurious behaviors.

Safety tools are questionnaires filled out by patients about their personal preferences, likes, dislikes and triggering issues, that are to be consulted by nurses during psychiatric crises. Patient A's safety tool identified as triggers being touched or forced to talk, and described becoming very quiet, isolating/avoiding people, swearing, crying and pacing when she gets upset. The patient wrote that the best intervention when she is upset, "not to talk to me." Boys or men upset patient A. As triggers, she identified: being forced to talk or answer questions; yelling or loud noises.

On November 16, 2015, Charge Nurse Sarah Bolger assigned Staff Nurse Nicole Sanchez to patient A. The grievant was the third nurse on duty that night, along with some Mental Health Workers ("MHW's").

During dinner in the kitchen, patient A picked at and ate some food, moved her tray away, and put her head on the table, where she remained after patients and staff departed. She was mute and unresponsive when Charge nurse Bolger tried to talk with her. Ms. Bolger assigned the grievant to stay with the patient to make sure she didn't hurt herself because of her history of self-injurious and suicidal behaviors.

During most of the video, the grievant stood leaning against the counter or the wall, quietly observing the patient from a respectful distance.

Ms. Sanchez was also in the room during much of the time, attempting to communicate with the patient verbally or non-verbally. Ms. Sanchez jumped up and down, made hand gestures, laughed, and banged her hand on the table. The patient made some hand gestures, which both nurses tried to mimic.

The patient appears mute throughout the silent video. When Ms. Sanchez pulled the chair out from under patient A, the grievant was standing about 6' away. Ms. Sanchez pulled the chair slowly and deliberately, but forcefully, until the chair was removed, and the patient appears to go onto her knees. The grievant briefly smiled or laughed as the chair was removed.

Ms. Sanchez also tried briefly to pull the table out from under the patient, but stopped. The patient remained kneeling with head on the table for a few minutes during which the grievant approached her, and touched her arm and head reassuringly. Shortly thereafter, the patient fell to the floor and curled in a ball.

Ms. Bolger entered the room several times. The grievant testified that Ms. Bolger told them that they needed the room, and, if patient A remained, she would have to call security.

The grievant testified that she did not stop Ms. Sanchez from pulling the chair because she perceived no danger to the patient, or intent to harm; rather, the chair was removed in a slow, deliberate movement, during which the patient could have stood at any time.

Four male security guards were summoned by Ms. Bolger. Patient A was restrained physically, mechanically and chemically, and placed in seclusion from 17:35 to 19:05, or for an hour and forty minutes.

The grievant wrote in the required restraint report that the Safety Tool was used. She explained at arbitration that she assumed Ms. Sanchez consulted the safety tool because Patient A was assigned to Ms. Sanchez and it is Hospital practice for nurses to review the Safety Tools of patients to whom they are assigned.

<u>Due Process</u>

The Union raises two threshold due process procedural challenges based on the Hospital's failure to provide a termination letter, failure to provide testimony of the decision-maker, and refusal to share a copy of the video until two weeks before arbitration. The Union asks me to

draw an adverse inference from the Hospital's failure to provide its rationale for terminating the grievant with a termination letter and testimony of the decision-maker. The Union asks me to conclude that the Hospital had no rationale to fire the grievant, and therefore to dismiss the charges against the grievant on this basis. The Union argues that the Hospital's delay in providing the video prejudiced its ability to defend the grievant.

1) Proof of rationale for the termination.

Union employees protected by a just cause Contract provision have the right to due process, including the right to <u>notice of charges</u> and the right to respond.

Although no written reasons were provided, in fact, the Hospital's Executive Program Director, Ms. O'Neill, read aloud four reasons for the grievant's termination at the termination meeting on December 15, 2015. The document from which she read the charges was introduced at arbitration:

> Jacqui – After our investigation we have found that you failed to follow protocol in not reviewing the Safety tool or pulling out the Safety tool during the Patient's Sit-in. You did not take action or inquire about a sitter. Jacque participated in joking with Nicole about the patient's hand gestures. Jacqui did not ask/instruct Nicole to stop moving the chair or table.
>
> Therefore, we are terminating your employment with Carney as of today.

Since the grievant had verbal notice of the reasons she was terminated, her right to notice was not violated.

However, the Hospital is limited to pursuit of those charges communicated orally to the grievant at her termination hearing. The Union is correct that the Hospital's attempt to bootstrap its case with

new reasons raised for the first time at arbitration violates due process, and, therefore, the new allegations cannot be considered.

The absence of testimony from the ultimate decision-maker is not a fatal flaw in the Hospital's case considering that two significant participants in the decision, Ms. O'Neill and Dr. Weinstein, both testified at length, explaining where they saw misconduct by the grievant in the video.

The Hospital's case must rise or fall on its proof of the four charges, and whether termination was appropriate.

<u>Hospital's delay in providing the video</u>:

The Union has the due process right to see the video of the incident upon which discipline was based. The extended delay in providing the video inhibited the Union's ability to defend the grievant, but does not require dismissal of charges here.

Although the Hospital misrepresented its reliance on the video and improperly withheld it until just weeks before arbitration, the question for me is whether the Union's case was thereby so irrevocably prejudiced that charges are unfair and must be dismissed.

The primary harm to the grievant was the absence of the video during the grievance process, which prejudiced the grievant's ability to explain her conduct. However, since the video was shared before arbitration, the grievant and her counsel had access to it to prepare for arbitration, which cured the due process violation, and removed the prejudice from delay because the video was produced in time for the Union and grievant to use it to prepare for, and during, arbitration.

It is contextually relevant that the existence of the video cameras was common knowledge, and that unfair labor practice charges by the Union concerning installation of video in the unit were pending and eventually were discussed and settled.

Considering that the Hospital corrected the due process violation about newly-installed video cameras, as well as the unfair labor charges pending over the new cameras that the parties negotiated over and resolved, the due process violation did not unfairly prejudice the grievant's case, and the charges will not be dismissed.

I will now consider the four charges communicated to the grievant at the discharge meeting:

1) <u>Failure to review the patient's safety tool</u>.

The DMH Human Rights Handbook requires the Hospital to prepare "safety tools" for each patient, six-page questionnaires that are used to identify important personal information, like what makes them feel unsafe or upset, signs they are getting upset or feel unsafe, preferred interventions and ways to make them feel safe and calm down. The safety tool includes how best to communicate when they are upset.

Patient A's safety tool was admittedly not reviewed or followed by the grievant, Ms. Sanchez or Ms. Bolger. Had it been, the restraint would not have been called. The tool explains that, when the patient gets upset, she withdraws socially. She can be triggered by men and loud voices. When she is upset, she withdraws, and is best left alone until she regains her composure.

There was no real pressure to use the kitchen for the baking class because other rooms could and previously had been used.

Several employees, including the grievant, failed to consult the patient's safety tool when confronted by the patient's crisis. Ms. Bolger, Ms. Sanchez and the grievant all should have consulted the patient's tool for insights into how to respond to her psychological crisis.

The grievant's defense that the patient was assigned to Ms. Sanchez explains her unfamiliarity with the patient's safety tool, but there was plenty of time during the crisis for someone to get the tool and for

20

everyone to read and follow it, as required by policy and procedures of the unit and DMH.

Although Ms. Sanchez and Ms. Bolger may have had greater responsibility to review the safety tool than did the grievant, the Hospital nonetheless had just cause to discipline the grievant for her failure to consult the safety tool during the extended time she worked with the patient in crisis. The responsibility of the other two nurses does not excuse the grievant's omission in this regard.

2) <u>Failure to inquire about a one-on-one sitter</u>.

The Employer argues that a one-to-one sitter would have been the best response to the circumstances, and charged the grievant with failure to request such an assignment.

In fact, Ms. Bolger assigned the grievant to stay with and watch the patient to ensure she did not hurt herself, which are the same duties as a one-to-one sitter.

The Hospital seeks to hold the grievant responsible for the unnecessary restraints by alleging that she should have asked Ms. Bolger to call in another employee to perform the same duties that Ms. Bolger had already assigned her to perform. This makes no sense. Ms. Bolger requested security to remove the patient from the kitchen. There is no evidence that the grievant advocated for the restraint, only the grievant's testimony that she asked Ms. Bolger about leaving the patient alone in the room.

The Hospital failed to prove any misconduct in this charge.

3) <u>Participation with Sanchez in joking about the patient's hand gestures</u>.

No misconduct was proven with respect to this charge.

The video shows the grievant and Ms. Sanchez using hand gestures with the patient to communicate and deescalate the situation. The

Hospital argues that Ms. Sanchez and the grievant were making fun of the patient.

The grievant described using humor to try and communicate with the patient, which she called a time-proven de-escalation technique.

Considering the recommended responses to the patient isolating herself in the safety tool, the imitated hand gestures may have been unhelpful, but the video does not show the grievant making fun of the patient. The gestures were made in good faith, without the benefit of the safety tool, without any bad intent.

4) <u>Failure to tell Sanchez to stop moving the chair and the table</u>.

Ms. Sanchez' decision to move the chair from under the patient was obviously a mistake that violated regulations and the requirement that patients be treated with dignity.

The video reveals that the grievant was standing nearby when Ms. Sanchez moved the chair, did not intervene, and appears to smile or laugh when she saw the chair pulled out from under the patient. Ms. Sanchez should not have pulled the chair out from under the patient, and was fired for it.

The Hospital seeks to hold the grievant vicariously liable with discipline for Ms. Sanchez' mistreatment of the patient based on the grievant's failure to intervene.

I spent considerable time reviewing the video evidence, including at arbitration when Hospital experts explained what they saw. In fact, the grievant did nothing affirmatively improper. Rather, she is charged with acts of omission, including failure to intervene when Ms. Sanchez pulled the chair.

It is beyond question that nurses are professionally and legally obliged to report patient mistreatment. This obligation can be enforced by management with discipline.

The grievant responds to the Hospital's charge about failing to intervene with the explanation that she did not perceive the chair-pull as dangerous or wrong. She appears in the video to smile or laugh when Ms. Sanchez pulled the chair.

I am persuaded that the grievant should have appreciated the impropriety of Ms. Sanchez's conduct, and should have intervened, at least verbally, especially when Ms. Sanchez started pulling the table from under the patient. Her failure to act provides cause for discipline.

Ms. Sanchez' chair pull did not appear dangerous, which was why the grievant did not intervene. Nonetheless, Ms. Sanchez's actions were improper, undignified treatment that could have escalated the patient's psychological crisis. The grievant should have intervened verbally with Ms. Sanchez on behalf of the patient, and should have reported to supervision how the patient ended up on the floor.

There was just cause to discipline the grievant was failing to intervene with Ms. Sanchez or report the mistreatment to supervision.

<u>There remains the question of was the penalty of termination appropriate under all of the circumstances</u>?

Employees covered by a just cause provision have the right to progressive discipline. This means the right to progressively increasing penalties to correct unacceptable performance or conduct to provide an opportunity to correct the problem before there is just cause for termination.

There is a narrow exception to this requirement in the most serious cases of misconduct, like violence and theft, when progressive discipline is not required for offenses so egregious that they are considered "capital" offenses in the workplace for which termination is appropriate in the first instance, without progressive, corrective discipline.

The grievant's proven performance failures were not capital offenses. She did not actively mistreat the patient. Her work with the patient, as

shown by the video, was professional. She failed to consult the safety tool, and failed to intervene when Ms. Sanchez pulled a chair out from under the patient.

A written reprimand is the usual first step of progressive discipline. Therefore, the grievant's termination will be converted to a written reprimand. I have considered that Ms. Bolger was only "coached" for calling security, but conclude that a reprimand is appropriate for the grievant because she did not intercede with Ms. Sanchez nor did she inform Ms. Bolger how the patient wound up on the floor.

**Conclusion:**

Underlying the grievant's termination was an unnecessary patient restraint recorded by newly-installed video surveillance that was the subject of Union unfair labor practice charges. The Hospital investigated the patient's complaint and disciplined several employees, including the grievant.

The Hospital's failure to provide reasons in writing and failure to provide testimony of the decision-maker did not violate the grievant's right to due process because the grievant and Union received verbal notice of the charges at a termination meeting when the Hospital communicated four reasons for the discharge to the grievant, and the Hospital's rationale for the grievant's termination was explained by Ms. O'Neill and Dr. Weinstein.

The Hospital cured its failure to provide the video by providing it before arbitration which gave the Union and grievant opportunity to use it to prepare and during presentation of their case. It also may be significant that the pending unfair labor practice charges may have complicated this issue and caused some delay.

The Hospital proved the grievant was guilty of two performance failures when she, Ms. Sanchez and Ms. Bolger failed to consult the patient's safety tool and failed to intervene when Ms. Sanchez pulled a chair from under the patient. All three nurses needed to consult the safety tool, or ensure that it was consulted, to understand how best to

defuse the patient's crisis. Their failure to do so resulted in poor treatment and unnecessary restraint and seclusion of patient A.

The video showed the grievant passively observing the patient from a respectful distance, ensuring she did not hurt herself, as assigned by Ms. Bolger.

The Hospital had just cause to discipline, but not to terminate, the grievant.

As remedy, the grievant's termination will be converted to a disciplinary warning, the Hospital will be directed to reinstate the grievant to her position, and the Hospital shall make her whole for lost benefits under the Contract, including back pay and seniority, minus interim earnings or unemployment benefits, if any, plus legal interest.


November 14, 2017                              Michael W. Stutz