UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEWARD CARNEY HOSPITAL, INC., | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 17-cv-12465-IT |
| | * | |
| MASSACHUSETTS NURSES ASSOCIATION, | * | |
| | * | |
| | * | |
| Defendant. | * | |

ORDER
September 20, 2019

TALWANI, D.J.

Plaintiff Steward Carney Hospital, Inc. (the "Hospital") and Defendant Massachusetts Nurses Association ("MNA" or "Union") are parties to a collective bargaining agreement containing an arbitration clause. The Hospital terminated the employment of a member of the bargaining unit (the "grievant"). The Union filed a grievance and the dispute was submitted to arbitration. An arbitrator determined that the Hospital had just cause to discipline, but not terminate, the grievant, and awarded, as a remedy, that the Hospital convert her discharge to a disciplinary warning, reinstate her to her position, and make her whole for lost wages and benefits.

The Hospital filed suit, asking the court to vacate the arbitrator's award on the grounds that the arbitrator exceeded his authority (Count I) and that enforcement of the award would violate well established Massachusetts public policy (Count II). The MNA counterclaimed, asking the court to confirm the arbitrator's award (First Counterclaim) and to award the MNA its fees (Second Counterclaim). The Hospital filed a Motion for Judgment on the Pleadings [#38] and the Union filed a Cross Motion for Judgment on the Pleadings as to First Counterclaim

[#49].[1] For the reasons addressed below, the court DENIES the Hospital's Motion [#38], ALLOWS the MNA's Motion [#49], and CONFIRMS the arbitration award.

I. Background

    A. *The Agreement to Arbitrate and the Submission of the Dispute to Arbitration*

The Hospital and the MNA are parties to the Collective Bargaining Agreement ("CBA") attached to the Complaint as Exhibit A. Complaint ¶ 5 [#1]; Exhibit A (the "CBA") [#1-1]; Answer ¶ 5. Under the CBA, if the MNA is not satisfied with any informal resolution of a grievance concerning disciplinary action, the MNA may timely refer a grievance to arbitration. CBA [#1-1], § 16.3. The CBA provides further that:

> Arbitrator's Authority: In the case of a grievance, the function of the arbitrator is to determine the interpretation and application of specific provisions of the Agreement. There shall be no right in arbitration of a grievance to obtain, and no arbitrator shall have any authority or power to award or determine, any change in, modification or alteration of, addition to, or detraction from, any of the provisions of this Agreement.

Id., § 16.5. Under the CBA, "[t]he decision of the arbitrator, if in accordance with the requirements of this Article, shall be final and binding upon the Hospital, the Association and the aggrieved nurse or nurses." Id.

The CBA includes the following management rights provisions:

> The Association recognizes the right of the Hospital to operate and manage the Hospital. Without limiting the generality of the foregoing, the Hospital reserves to itself, subject only to the express provisions of this Agreement, the management of the Hospital, the right to require reasonable standards of performance and the maintenance of discipline, order and efficiency; the determination of medical and nursing care standards, operational and other policies; the determination of methods and procedures; the determination of the quantity and type of equipment to be used; the determination of the number and location of facilities and whether the whole or any part of its operations shall continue to operate; the direction of the nurses and the reasonable assignment of work; the right to hire, transfer temporarily, discharge, suspend, demote or to otherwise discipline nurses for just cause; the right to lay off nurses for lack of work or for other reasons and to recall nurses; the right to require reasonable overtime work; the right to promulgate and enforce all

---

[1] The MNA did not seek judgment on the pleadings as to the Second Counterclaim for fees.

reasonable rules relating to operations, safety and other matters. In the exercise of the foregoing rights of management, the Hospital agrees that it will not violate the specific provisions of this Agreement.

. . .

CBA [#1-1], ¶ 4.1.

The CBA also includes the following "just cause" provision: "A nurse who has completed her probationary period and has acquired seniority under this Agreement shall not be suspended, discharged, demoted or otherwise disciplined except for just cause." Id. par. 15.8.

The parties submitted the following questions to arbitration:

1. Did [the] Hospital have just cause to terminate the employment of [the grievant]?
2. If not, what shall be the remedy?

Complaint ¶ 48; Answer ¶ 48.

### B. The Arbitrator's Factual Findings

As a general proposition, "an arbitrator's factual findings are not open to judicial challenge." El Dorado Tech. Servs., Inc. v. Union Gen. de Trabajadores, 961 F.2d 317, 320 (1st Cir. 1992). The parties offer no argument as to why this rule would not apply here, and accordingly, the court accepts and recounts the facts as found by the arbitrator. See Compl. Ex. G, Arbitrator's Opinion and Award (the "Award") [#1-7].

#### i. The Hospital's Adolescent Psychiatric Unit and its Policies

The Hospital's adolescent psychiatric unit is a secure, locked facility with 14 beds for adolescent patients who are involuntarily committed to treat serious psychiatric conditions. Id. at 2. For licensure purposes, the Hospital follows regulations of the Department of Mental Health ("DMH"). Id. In accordance with those regulations, Hospital policy permits "restraints and seclusion to prevent injury[] only in emergency situations when there is the substantial risk of or the occurrence of serious physical assault or self-destructive behavior." Id. at 3. The Hospital

utilizes "[s]afety tools, which are questionnaires filled out by patients about their personal preferences, likes, dislikes and triggering issues, that are to be consulted by nurses during psychiatric crises." Id. at 16. Hospital policy requires staff to try alternatives to restraints including referring to a patient's safety tool, verbal intervention, or other de-escalation tactics. Id. at 3.

The Hospital has also promulgated a policy, entitled Psychiatric Staff, Patient Relationships (hereinafter the "Patient Relationship Policy"), that includes the following provisions:

> In order to ensure that psychiatric patients are not subjected to inappropriate physical or social relationships with a member of the treatment team, the following guidelines have been developed:
>
> 1. Should a staff member witness or suspect any inappropriate interaction with a patient it should be immediately reported to their supervisor.

Id. at 8-9.

### ii. *The Conduct at Issue*

At the time of the incident, the unit was staffed by a Charge Nurse (nurse #1), two registered nurses (nurse #2 and the grievant),[2] and several Mental Health Workers. Id. at 16. Among the patients in the unit was a transgender female patient (referred to as Patient A in the Award) who had a "history of self-injurious and suicidal behaviors." Id.

> Patient A's safety tool identified as triggers being touched or forced to talk, and described becoming very quiet, isolating/avoiding people, swearing, crying and pacing when she gets upset. The patient wrote that the best intervention when she is upset, "not to talk to me." Boys or men upset patient A. As triggers, she identified: being forced to talk or answer questions; yelling or loud noises.

Id. This patient was assigned to Nurse #2. Id.

---

[2] The court uses these pseudonyms per its Order [#48] allowing the Union's Motion for Privacy Protection Pursuant to FRCP 5.2(e)(1) [#12], but substitutes "Charge Nurse" for "nurse #1" to better track the arbitrator's award.

During dinner, patient A ate some food, pushed her tray away, and put her head down on the table, where "she remained after the other patients and the staff departed." Id. The Charge Nurse tried to interact with the patient, who was mute and unresponsive. Id. "[The Charge Nurse] assigned the grievant to stay with the patient to make sure she didn't hurt herself." Id. The grievant watched the patient from "a respectful distance," leaning against a counter or wall. Id. "[Nurse #2] attempt[ed] to communicate with the patient verbally or non-verbally." Id. "[Nurse #2] jumped up and down, made hand gestures, laughed, and banged her hand on the table." Id. "The patient made some hand gestures, which both nurses tried to mimic." Id.

[Nurse #2] pulled the chair out from under [the patient] "slowly and deliberately, but forcefully" and the patient appears to go onto her knees." Id. at 17. "The grievant briefly smiled or laughed as the chair was removed." Id. "[Nurse #2] also tried briefly to pull the table out from under the patient, but stopped." Id. "The patient remained kneeling with [her] head on the table for a few minutes during which the grievant approached her, and touched her arm and head reassuringly." Id. "Shortly thereafter, the patient fell to the floor and curled in a ball." Id.

The Charge Nurse threatened to call security if the patient did not move. Id. Four male security guards arrived and the patient "was restrained physically, mechanically and chemically, and placed in seclusion from 17:35 to 19:05, or for an hour and forty minutes." Id.

iii. *The Patient's Complaint and the Hospital's Investigation*

Patient A filed a complaint about her treatment in which she alleged that staff failed to follow her safety tool. Id. at 5. Hospital management watched a video of the incident "which revealed no danger of injury to the patient or others[] (at least until several male security officers put their hands on the patient), and an investigation ensued." Id.

        iv. *The Discipline Imposed*

Hospital terminated the grievant for her part in the incident. The Hospital did not issue a termination letter, but read the following to the grievant at her termination meeting:

> [Grievant] – After our investigation we have found that you failed to follow protocol in not reviewing the Safety tool or pulling out the Safety tool during the Patient's Sit-in. You did not take action or inquire about a sitter. [You] participated in joking with [Nurse #2] about the patient's hand gestures. [You] did not ask/instruct [Nurse #2] to stop moving the chair or table.

Id. at 6, 18. The Hospital also terminated Nurse 2 for her part. The Charge Nurse "received 'coaching'" for her part.

    C. *The Arbitration Award*

The arbitrator held that due process required that "the Hospital [be] limited to pursuit of those charges communicated orally to the grievant at her termination hearing." Id.

The arbitration found no cause to discipline the grievant for failing to inquire about a one-on-one sitter or for her use of hand gestures, but found the Hospital had just cause to discipline the grievant for failing to consult the patient's safety tool and failing to tell Nurse #2 to stop moving the chair and table. Id. 20-23. The arbitrator found that the grievant's "proven performance failures were not 'capital offenses.'" Id. at 23. The grievant "did not actively mistreat the patient" and her work was "professional." Id. at 23-24. Accordingly, the arbitrator found that progressive discipline was appropriate and converted the grievant's termination to a written reprimand. Id.

II.    Analysis

    A. *Standard of Review*

"'In order to assess whether the arbitrator exceeded his contractual authority to resolve the parties' dispute, we look first at the specific provisions of the CBA and the agreement to

arbitrate it contains.'" Steward Holy Family Hosp., Inc. v. Mass Nurses Ass'n, 932 F.3d 14, 17 (1st Cir. 2019) (quoting Butler Mfg. Co. v. United Steelworkers, 336 F.3d 629, 633 (7th Cir. 2003)). The court grants "extreme" deference to the arbitrator's interpretation of the CBA. Id. (quoting Salem Hosp. v. Mass. Nurses Ass'n, 449 F.3d 234, 237 (1st Cir. 2006)). "If an arbitration award rests on a plausible interpretation of the underlying contract," the court must uphold it." Id.; see also United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987) ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."). What the arbitrator may not do, however, is "'ignore the contract and simply dispense "his own brand of industrial justice."'" Id., quoting Kraft Foods, Inc. v. Office & Prof'l Emps. Int'l Union, Local 1295, 203 F.3d 98, 100 (1st Cir. 2000) (quoting United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960)).

### B. Did the Arbitrator Exceed His Authority?

The Hospital alleges that the arbitrator did not follow the terms of the CBA when issuing the award. The Hospital points out that the Patient Relationship Policy includes the provision that "'[a]ny violation of this policy will result in an immediate termination.'" Pl.'s Mem. In Supp. of Mot. for J. ("Hospital's Br.") [#39] at 12-13; Exhibit E [#1-5]. The Hospital argues that this provision is incorporated into the CBA through the Management Rights clause, and required the grievant's automatic termination. In the Hospital's view, once the arbitrator determined that the grievant "should have reported to supervision how the patient ended up on the floor," the arbitrator was required to uphold the grievant's termination. Id. at 13, citing Award [#1-7] at 23.

The Hospital's reliance on that Policy is misplaced. The arbitrator's comment that the incident should have been reported does not mean that the arbitrator found a violation of the

Patient Relationship Policy. Indeed, on its face, the Patient Relationship Policy appears to be primarily directed at inappropriate physical or social relationships, including sexual contact. Perhaps it was for this reason that the Hospital's verbal termination notice made no mention of the Patient Relationship Policy.

In any event, contrary to the Hospital's argument, the arbitrator made no finding that the Patient Relationship Policy was violated. Although the record demonstrates that the Patient Relationship Policy was an exhibit at the arbitration, the arbitrator found that due process limited the grounds for termination to be those given to the grievant at the time of her termination. The Hospital did not argue that the grievant's termination should be upheld for violating the Patient Relationship Policy but "because she failed to consult the patient's safety tool, because she failed to inquire as to a [sitter], because she participated in the mocking of the patient's hand gestures, and because she sat idly by as pulled out the patient's chair from underneath her." See Post hearing brief [#60-1] at 11. The court thus finds that the Hospital has waived the argument that termination should be upheld based on the grievant's alleged violation of the Patient Relationship Policy.

The court notes the Hospital's argument is similar to that recently rejected by the First Circuit in a dispute between the MNA and another hospital represented by the same counsel as the hospital here. See Steward Holy Family Hosp., Inc. v. Mass Nurses Ass'n, 932 F.3d 14 (1st Cir. 2019). In that case, the district court accepted the Hospital's argument that once the arbitrator concluded the employee's conduct constituted a certain offense, and that offense was listed as terminable under a hospital policy, "the arbitrator's 'role was fulfilled' and he was not at liberty to prescribe a lesser form of discipline." Id. at 19, quoting Steward Holy Family Hosp., Inc. v. Mass. Nurses Ass'n, 350 F. Supp. 3d 7, 14-15 (D. Mass. 2018). The First Circuit rejected

that argument, noting that the arbitrator had not found that the conduct amounted to the offense listed in the policy. Moreover, as the court explained, under the CBA, while "[t]he Hospital certainly retained the exclusive right to discipline and discharge even tenured, non-probationary nurses, . . . .it could only do so for 'just cause.'" Id. Accordingly, the "reasonableness" of the hospital's discipline was "subject to arbitral review," and the arbitrator's authority was not limited in modifying the discipline imposed. Id.

Similarly here, both the contract provision relating directly to discipline and the management rights provision require "just cause" for such discipline. CBA [#1-1], ¶¶ 4.1, 15.8. Just as in the case before the First Circuit, the employer's policy does not change the requirement that discipline requires "just cause." Under the CBA, the arbitrator was therefore required to determine if the termination was for just cause. Indeed, the questions the parties posed to the arbitrator asked if the Hospital had "just cause to terminate the employment of [the grievant]" and, if not, what would be the appropriate remedy. Award [#1-7] at 2.

In sum, the Hospital has failed to demonstrate that the arbitrator did not follow the terms of the CBA when issuing the award.

### C. Does the Award Violate Public Policy?

The Hospital argues that the Award violates public policy and should be vacated. The public policy exception is "narrow." Mercy Hospital, Inc. v. Mass. Nurses Ass'n, 429 F.3d 338, 343 (1st Cir. 2005). In order for a court to vacate an arbitration award, "the award must violate an 'explicit ... well defined and dominant' public policy, as ascertained 'by reference to ... laws and legal precedents.'" Id. (quoting W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 766 (1983)). The court "must determine whether Massachusetts has a public policy, ascertained by reference to positive law, that prohibits reinstating [the

grievant] in these circumstances." Bos. Med. Ctr. v. Serv. Employees Int'l Union, Local 285, 260 F.3d 16, 23 (1st Cir. 2001). The courts analysis must be based on the facts as found by the arbitrator, not the facts presented by the Hospital in its brief. United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 45 (1987) ("The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them….").

In support of its argument, the Hospital cites to DMH regulations that require hospital staff to meet "clinical competencies and operational standards," that all personnel be "qualified" and demonstrate "competencies" and that provide that the Hospital could lose its license if it cannot provide proper treatment to patients. Hospital Br. at 15-18. The Hospital contends these requirements together establish a public policy that bars the grievant's return to work at the Hospital.

However, nothing in the regulations establishes a policy that a nurse who committed the grievant's conduct be prohibited from working at a hospital. See Bos. Med. Ctr. 260 F.3d at 23 (holding that the question is whether the order to reinstate the grievant violates public policy). The only positive law that could be discerned from the Hospital's argument is a policy against hospitals employing unqualified personnel. Notably, while the Hospital could have reported the grievant's conduct to the Massachusetts agency governing the registration of nurses, the Arbitrator found that the Hospital did not file a report about the grievant's conduct with any such state agency. Award [#1-7] at 9. The Hospital offers no connection between the Arbitrator's Award and "some explicit public policy that is well defined and dominant and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." Misco, 484 U.S. at 43 (internal quotations and citations omitted).

10

III.     Conclusion

The Hospital has not demonstrated that the Award is in excess of the Arbitrator's grant of authority or is in violation of public policy. Accordingly, the Hospital's <u>Motion for Judgment on the Pleadings</u> [#38] is DENIED and the Union's <u>Cross Motion for Judgment on the Pleadings as to First Counterclaim</u> [#49] is ALLOWED.

IT IS SO ORDERED.

Date: September 20, 2019                                            /s/ Indira Talwani
                                                                                                                    United States District Judge